UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| WUMAC, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> EAGLE CANYON LEASING, INC., ) <br> ) <br> Defendant. ) <br> ) | 2:12-cv-0926-LRH-VCF <br><br> ORDER |

Before the Court is Defendant Eagle Canyon Leasing, Inc.'s ("Eagle") Motion for Summary Judgment. Doc. #49.[1] Plaintiff WuMac, Inc. ("WuMac") filed an Opposition (Doc. #52), to which Eagle Replied (Doc. #55). Also before the Court is WuMac's Motion to Strike an exhibit included in Eagle's Motion for Summary Judgment. Doc. #54. Eagle filed an Opposition (Doc. #56), to which WuMac Replied (Doc. #59).

I.   **Facts and Background**

On June 18, 2008, Eagle entered into a Aircraft Purchase Agreement ("APA") to purchase a Canada Regional Jet ("CRJ") aircraft with the serial number 7471 from Atlanta Jet, Inc. ("Atlanta Jet") for $19.2 million. Doc. #49 at 4. The contract specified that Atlanta Jet was to deliver CRJ 7471 fully converted for private use, and that Flying Colours, Inc. ("Flying Colours") would perform the conversion work. *Id.* Eagle states that when it formed this contract, it was unaware

---

[1] Refers to the court's docket number.

that CRJ 7471 was owned by WuMac. *Id.* On June 19, 2008, Atlanta Jet and WuMac entered into an APA whereby WuMac would sell CRJ 7471 to Atlanta Jet for $18.3 million. *Id.* at 5. The contract provided that WuMac would deliver CRJ 7471 fully converted for private use, and Flying Colours would perform the conversion work. *Id.*

Both of these contracts provided for a "target Delivery Date of on or about October 15, 2008 or such other date as may be mutually agreed upon by both parties in writing." *Id.* at 6; *id.*, Ex. 7 at ECL00039; *id.*, Ex. 10 at PLF711. Both contracts also provided that the third deposit on the purchases would be paid once the selling party provided the purchasing party with a 90 Day Notice that the aircraft would be completed by a certain date. *Id.* at 7; *id.*, Ex. 7 at ECL00038; *id.*, Ex. 10 at PLF710-11. On August 11, 2008, WuMac delivered the 90 Day Notice to Atlanta Jet, which then delivered the 90 Day Notice to Eagle. *Id.* at 6. The 90 Day Notice stated that the anticipated delivery was November 15, 2008, "which should include all necessary test flights and operational review." *Id.*; *see id.*, Ex. 13. After Eagle Senior Vice President Norm Freeman ("Freeman") expressed concerns about the delay, Atlanta Jet President Rick Steelman ("Steelman") responded that "a small variance in delivery date is standard in the industry hence the 'on or about' language mentioned in our agreement." *Id.* at 8; *see id.*, Ex. 16. The aircraft was not converted and delivered by August 9, 2009, because Flying Colours was unable to obtain the required Federal Aviation Administration ("FAA") certifications for the aircraft's modifications by that date. *Id.* On November 25, 2008, Eagle notified Atlanta Jet that it was in default and that Eagle was terminating their contract. *Id.* The FAA certified the modifications to CRJ 7471 on April 28, 2009. *Id.*, Ex. 35. WuMac subsequently tendered the aircraft to Atlanta Jet on July 2, 2009, and Atlanta Jet tendered the aircraft to Eagle on August 4, 2009. *Id.* Having previously stated its intent to terminate the contract, Eagle rejected Atlanta Jet's tender. *Id.*

Eagle filed suit against Atlanta Jet, requesting the return of $2.25 million that Eagle had spent in deposits for the aircraft on December 4, 2008. *Id.* at 9. This action was subsequently consolidated with an action filed by Atlanta Jet against Eagle and WuMac in the Northern District

Court in Georgia. *Id.* at 10. All parties were voluntarily dismissed from this action under Federal Rule of Civil Procedure 41. *See id.*, Ex. 25. On September 30, 2010, Atlanta Jet filed for Bankruptcy under Chapter 7 of the United States Code. *Id.* Eagle pursued payment from Atlanta Jet through the bankruptcy court, and the parties ultimately reached a settlement. *Id.*

WuMac filed suit against Eagle on June 1, 2012, alleging causes of action for breach of contract on multiple theories, promissory estoppel, and quantum meruit. Doc. #1. On February 14, 2013, the Court granted Eagle's Motion to Dismiss in part, dismissing WuMac's claims for promissory estoppel and quantum meruit. Doc. #30 at 7. Eagle filed its Motion for Summary Judgment on July 25, 2014 (Doc. #49), and WuMac filed its Motion to Strike on August 22, 2014 (Doc. #54).

**II.     Legal Standard**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001). A motion for summary judgment can be complete or partial, and must identify "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On

1  an issue as to which the nonmoving party has the burden of proof, however, the moving party can
2  prevail merely by demonstrating that there is an absence of evidence to support an essential element
3  of the non-moving party's case. *Celotex*, 477 U.S. at 323.
4        To successfully rebut a motion for summary judgment, the nonmoving party must point to
5  facts supported by the record that demonstrate a genuine issue of material fact. *Reese v. Jefferson*
6  *Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect
7  the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248. Where
8  reasonable minds could differ on the material facts at issue, summary judgment is not appropriate.
9  *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered
10  genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving
11  party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of
12  the party's position is insufficient to establish a genuine dispute; there must be evidence on which a
13  jury could reasonably find for the party. *See id.* at 252. "[S]peculative and conclusory arguments
14  do not constitute the significantly probative evidence required to create a genuine issue of material
15  fact." *Nolan v. Cleland*, 686 F.2d 806, 812 (9th Cir. 1982).
16  **III.    Discussion**
17      **A.  Motion to Strike**
18        WuMac moves to strike a letter attached as Exhibit 21 to Eagle's Motion for Summary
19  Judgment because it "constitutes a communication between Plaintiff's counsel and counsel for a
20  party in a separate action then being conducted in Georgia." Doc. #54 at 2. Eagle argues that the
21  letter should not be stricken because nothing in the letter indicates that it was meant as part of
22  settlement negotiations, and Rule 408 therefore does not apply. Doc. #56 at 3. The letter from
23  WuMac counsel Marilyn Mistretta ("Mistretta") to Atlanta Jet counsel Adam Katz states: "The
24  only agreement to which WuMAC is a party is the purchase agreement between it, as seller, and
25  Atlanta Jet, as purchaser, of the plane. We have no contractual relationship with Atlanta Jet's
26  buyer of the plane, only with Atlanta Jet itself." Doc. #49, Ex. 21.

Federal Rule of Evidence 408(a) provides that "conduct or a statement made during compromise negotiations about the claim" is inadmissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Rule 408 applies even when "the party seeking to introduce evidence of a compromise was not involved in the original compromise." *Hudspeth v. Comm'r of Internal Revenue Serv.*, 914 F.2d 1207, 1213 (9th Cir. 1990). However, "evidence of compromise is admissible if offered for purposes not prohibited by" Rule 408(a). *Dannenbring v. Wynn Las Vegas, LLC*, 907 F. Supp. 2d 1214, 1219 (D. Nev. 2013).

The Court agrees with Eagle that the letter does not include any language to indicate that it was sent as part of settlement negotiations. *See Nev. Disability Advocacy & Law Ctr. v. Willden*, No. 2:05-cv-0757, 2007 WL 1063170, at *3 (D. Nev. Apr. 5, 2007) (finding Rule 408 inapplicable because the disputed letter did not "request any concessions" in return for the author's compromise). WuMac argues that the entire letter is part of settlement discussions because it is a response to a July 15, 2009 letter from Atlanta Jet which requested mediation between Eagle, WuMac, and Atlanta Jet. Doc. #59 at 5. However, neither the July 15, 2009 letter, nor the July 17, 2009 letter discusses terms of settlement or requests concessions from the other party in return for certain compromises. Accordingly, the Court denies WuMac's Motion to Strike Mistretta's July 15, 2009 letter.

### B. Motion for Summary Judgment

To prevail on a breach of contract claim, a plaintiff must demonstrate: (1) the existence of a valid contract; (2) that plaintiff performed or was excused from performance; (3) a breach by the defendant; and (4) damages resulting from defendant's breach. *See* Restatement (Second) of Contracts § 203 (2007); *see also Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006) (citing *Richardson v. Jones*, 1 Nev. 405, 405 (1865)). An enforceable contract requires: (1) an offer and acceptance; (2) meeting of the minds; and (3) consideration. *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005).

5

In order for WuMac to prevail on its breach of contract claims, WuMac must first establish that the parties entered into a valid contract. On its face, it appears that no contract exists between WuMac and Eagle. The two contracts at issue show that WuMac sold CRJ 7471 to Atlanta Jet, and Atlanta Jet then sold CRJ 7471 to Eagle in a separate contract. Doc. #49, Ex. 7; *id.*, Ex. 10. WuMac has raised two bases on which it argues that Eagle is bound by contract to WuMac. First, WuMac argues that the two contracts, viewed together, indicate that WuMac was the seller, Eagle was the buyer, and Atlanta Jet was merely an intermediary to a single contract. Doc. #52 at 12. Second, WuMac argues that it was a third party beneficiary of the contract between Eagle and Atlanta Jet. *Id.* at 24.

### 1.     WuMac / Eagle Canyon Contract

Eagle argues that WuMac's first argument must fail because "it is self-evident that the *only parties* to the WuMAC APA were WuMAC and Atlanta Jet and that Atlanta Jet would take title to the Aircraft at closing." Doc. #49 at 13. WuMac president Allyn Caruso ("Caruso") stated in his deposition that he knew that this was a back-to-back transaction and that Atlanta Jet would sell to Eagle after closing. *Id.*, Ex. 5 at 53:11-20. Eagle argues that based on this knowledge, WuMac could have contracted to sell directly to Eagle if it wanted to form a contract relationship with Eagle. *Id.* at 13. Eagle also emphasizes that WuMac admitted that it had no contract with Eagle, stating in a letter to Atlanta Jet: "We have no contractual relationship with Atlanta Jet's buyer of the plane, only with Atlanta Jet itself." *Id.*, Ex. 21. Finally, Eagle argues that even if a contract did exist between Eagle and WuMac, it would be barred by the statute of frauds because no writing exists for the sale of goods valued at more than $500. *Id.* at 12. WuMac's central argument is that WuMac and Eagle entered into a valid contract in which Atlanta Jet merely operated as an agent or broker for Eagle, and "the two agreements necessarily must be construed as a single contract, which is in writing, and which together satisfies the statute of frauds." Doc. #52 at 18.

The Court agrees with Eagle that the two contracts do not represent a single unified contract between Eagle and WuMac. Eagle contends that "[t]reating two agreements as a single agreement

6

is only appropriate where the two agreements involve the same parties and involve the same subject matter, such that collapsing the agreements together would actually help elucidate the parties' intent." Doc. #55 at 12. Although the contracts at issue here do not involve the same parties, they do involve the same subject matter: CRJ 7471. Moreover, although the contracts do not on their face involve the same parties, the Eagle/Atlanta Jet contract was executed before Atlanta Jet had purchased CRJ 7471 from WuMac. This is important because as WuMac argues, the Eagle/Atlanta Jet contract "could not be performed without the Atlanta Jet/WuMAC agreement, and because all parties knew of the necessity of both agreements to make the unified deal work, the two agreements necessarily must be construed as a single contract." Doc. #52 at 18.

WuMac cites *In re Steen* to support its claim that the contracts must be read as a single unified contract. *In re Steen* involved two contracts that contained the same parties and subject matter but did not have integration clauses. The court held:

> Given the size of the transaction, the related subject matter of the two documents, the fact that they were contemporaneously negotiated, drafted, executed and delivered, and the substantial certainty that neither would have been executed without the other, it is apparent that they integrate a single large transaction. Where two or more written agreements are contemporaneously executed as part of one complete transaction, we have labeled 'elemental' the proposition that they must be construed together.

*Id.* Unlike in *In re Steen*, the contracts at issue here both had integration clauses. The presence of the integration clause distinguishes the present case from *In re Steen*, and indicates that despite their similarities, the two contracts cannot be read as a single contract. *See St. Vincent Med. Ctr. v. Mega Life and Health Ins. Co.*, 585 Fed. Appx. 417, 417 (9th Cir. 2014) (rejecting an argument that two contracts must be read as a single contract because the argument failed "to give effect to the integration clause contained" in one of the agreements).

The Nevada Supreme Court addressed the question of whether two contracts can be read as a single contract if one contains an integration clause in *Whitemaine v. Aniskovich*, 183 P.3d 137 (Nev. 2008). In *Whitemaine*, the plaintiff entered into two employment contracts within three days of each other. *Id.* at 140. The first, with Bank of America, included a standard integration clause.

7

*Id.* The second, with Banc of America Investment Services, repeatedly mentioned the Bank of America contract, but did not purport to modify or supercede the prior contract. *Id.* The court concluded that two separate contracts can constitute a single contract "if (1) they are contemporaneously executed, (2) they concern the same subject matter, and (3) one of the instruments refers to the other." *Id.* at 141 (citing *Collins v. Union Fed. Sav. & Loan Ass'n*, 662 P.2d 610, 615 (Nev. 1983)). The contemporaneous execution requirement "can be satisfied in a wide range of time spans," from contracts signed on the same day, to contracts signed within months of each other. *Id.* at 141-42. The subject matter requirement dictates that the contracts must concern the same underlying parties or objects. *Id.* at 142. For the reference requirement, "while one of the instruments must reference the other, both instruments are not required to reference each other." *Id.* at 143.

Here, the evidence indicates that WuMac could establish the first two prongs of *Whitemaine*: that the two contracts were contemporaneously executed and concerned the same subject matter. WuMac cannot establish the third prong, however, because neither contract directly references the other in substantive manner. WuMac points out that paragraph 12 of the Eagle/Atlanta Jet contract references WuMac by name, but this cannot meet the reference requirement contemplated by *Whitemaine* because the paragraph refers to a litany of other entities, and does not indicate the existence of any contract concerning WuMac. Accordingly, the two contracts cannot be read as a single contract because both contain integration clauses, and neither contract substantively references the other.

Having concluded that the contracts do not represent a single unified contract between Eagle and WuMac, the Court must consider whether a genuine dispute of material fact remains as to whether Atlanta Jet was acting as an agent of Eagle when it entered into the contract to purchase CRJ 7471 from WuMac. "An agency relationship is formed when one who hires another retains a contractual right to control the other's manner of performance." *Grand Hotel Gift Shop v. Granite St. Ins. Co.*, 839 P.2d 599, 602 (Nev. 1992). "The burden of proving an agency relationship rests

on the party asserting that such a relationship exists." *Trump v. Eighth Judicial Dist. Court of State of Nev. in and for Cnty. of Clark*, 857 P.2d 740, 745 n.3 (Nev. 1993). "The existence of an agency relationship is generally a question of fact for the jury if the facts showing the existence of agency are disputed, or if conflicting inferences can be drawn from the facts." *Schlotfeldt v. Charter Hosp. of Las Vegas*, 910 P.2d 271, 274 (Nev. 1996). However, "whether sufficient competent evidence is present to require that the agency question be forwarded to a jury" is a question of law. *Id.*

WuMac points to no evidence that an express agency relationship existed between Eagle and Atlanta Jet. Instead, WuMac refers to deposition testimony that WuMac argues indicates that there remains a genuine dispute of material fact as to whether Atlanta Jet acted as Eagle's agent. Caruso testified, for example, that he was first contacted by Eagle's Mark Brady ("Brady") about purchasing an aircraft, and that Brady said that Atlanta Jet would contact WuMac to continue the transaction. Doc. #53, Ex. C at 24:4-13. Additionally, Brady testified that he met with WuMac's Caruso prior to purchasing CRJ 7471 from Atlanta Jet. *Id.*, Ex. B at 68:10-22. Finally, Atlanta Jet's Steelman described the two contracts representing the purchase of CRJ 7471 by Eagle from WuMac as a "simultaneous passthrough." *Id.*, Ex. E at 29:21-23. Eagle maintains that no agency relationship existed between Eagle and Atlanta Jet, and argues that any agency relationship would need to be in writing because the underlying transaction involved a sale of goods valued at more than $500. Doc. #49 at 17-18.

Viewing the evidence in the light most favorable to WuMac, the deposition testimony referenced by WuMac is insufficient to create a genuine dispute of fact as to whether Atlanta Jet was acting as Eagle's agent when it purchased CRJ 7471 from WuMac. Rather, the evidence before the Court indicates the existence of two completely separate contracts. In the absence of convincing evidence that Eagle intended for Atlanta Jet to act as its agent to purchase CRJ 7471 from WuMac, the Court finds as a matter of law that WuMac has not met its burden to show that an agency relationship existed between Eagle and Atlanta Jet, such that Eagle is bound in contract to WuMac. *See Schlotfeldt*, 910 P.2d at 274 (finding that "whether sufficient competent evidence is

present to require that the agency question be forwarded to a jury" is a question of law). Accordingly, the Court grants summary judgment in favor of Eagle on WuMac's direct breach of contract claims. *See Liberty Lobby*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to preclude summary judgment).

### 2. **WuMac as Third Party Beneficiary**

To obtain status as a third party beneficiary, "there must clearly appear a promissory intent to benefit the third party, and ultimately it must be shown that the third party's reliance thereon is foreseeable." *Lipshie v. Tracy Inv. Co.*, 566 P.2d 819, 824-25 (Nev. 1977) (internal citation omitted). In order for an entity to be a third party beneficiary, the underlying agreement must be made for that entity's benefit. *Olsen v. Iacometti*, 533 P.2d 1360, 1363 (Nev. 1975). "The fact that he might incidentally benefit by the performance of the agreement is insufficient." *Id.* "Whether an individual is an intended third-party beneficiary turns on the parties' intent, 'gleaned from reading the contract as a whole in light of circumstances under which it is entered.'" *Wright v. Incline Village Gen. Improvement Dist.*, 597 F. Supp. 2d 1191, 1205 (D. Nev. 2009) (quoting *Canfora v. Coast Hotels & Casinos, Inc.*, 121 P.3d 599, 605 (Nev. 2005)).

Eagle argues that WuMac cannot be a third party beneficiary of the contract between Eagle and Atlanta Jet because the contract was not "made for" WuMac's benefit. Doc. #49 at 21. Based on the available evidence, however, it cannot be said that WuMac was merely an incidental beneficiary of the contract. In the Eagle/Atlanta Jet contract, executed June 18, 2008, Atlanta Jet agreed to sell CRJ 7471 to Eagle. Atlanta Jet did not have title to CRJ 7471 when this contract was executed. Rather, Atlanta Jet only obtained title to CRJ 7471 on June 19, 2008, when WuMac contracted to sell the aircraft to Atlanta Jet. The Eagle/Atlanta Jet contract was therefore premised on the assumption that WuMac would contemporaneously sell CRJ 7471 to Atlanta Jet, regardless of whether WuMac was expressly mentioned in the Eagle/Atlanta Jet contract in a substantive manner. Reading "the contract as a whole in light of circumstances under which" it was entered, the Eagle/Atlanta Jet contract involved an inherent promissory intent to benefit WuMac, and it was

foreseeable that WuMac would rely upon the benefit created by that contract. *See Wright*, 597 F. Supp. 2d at 1205; *Lipshie*, 566 P.2d at 824-25. Based on the foregoing, disputed facts remain as to whether WuMac was an intended beneficiary of the contract between Eagle and Atlanta Jet. *See Williams v. Univ. Med. Ctr. of S. Nev.*, 688 F. Supp. 2d 1134, 1143-44 (D. Nev. 2010) (finding genuine issues of material fact existed as to whether plaintiff was an intended third party beneficiary, precluding summary judgment").

Eagle argues that even if it had contractual obligations to WuMac, the Court should grant summary judgment in its favor because WuMac caused Atlanta Jet's breach of its contract with Eagle by failing to deliver CRJ 7471 in a timely manner under the terms of the Atlanta Jet/WuMac contract. Both contracts set a "target Delivery Date of on or about October 15, 2008 or such other date as may be mutually agreed upon by both parties in writing." Doc. #49, Ex. 7 at ECL-00039. On August 11, 2008, WuMac informed Atlanta Jet, which in turn informed Eagle, that the anticipated delivery was November 15, 2008. Doc. #49 at 6. The parties represented that delivery by this date would "include all necessary test flights and operational review." *Id.* Conversion of the aircraft was thereafter delayed due to FAA certification setbacks. Doc. #52 at 22. The FAA ultimately certified the modifications to CRJ 7471 on April 28, 2009. Doc. #49, Ex. 25. However, WuMac did not tender the aircraft for delivery to Atlanta Jet until July 2, 2009, and Atlanta Jet did not tender the aircraft for delivery to Eagle until August 4, 2009. *Id.* at 25.

Eagle contends that the failure to tender CRJ 7471 by or near the date specified in the contract violated the perfect tender rule, which states that a buyer may reject shipment "if the goods or the tender of delivery fail in any respect to conform to the contract." NRS § 104.2601. Eagle argues that it could not have breached the contract because the contract was already severed when WuMac and Atlanta Jet failed to deliver the aircraft "on or about October 15, 2008." WuMac counters that its late delivery of the aircraft did not constitute a breach of the contract, which does not set a clear required delivery date, but rather identifies a "target Delivery Date" of "on or about October 15, 2008." Furthermore, WuMac argues that its delay was excused because the

11

modifications to CRJ 7471 were not certified by the FAA until April 28, 2009.

The Uniform Commercial Code recognizes an excuse for breach when performance of a term of a contract "has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order." NRS § 104.2615(1). WuMac argues that the FAA's certification delay constitutes a valid excuse for Atlanta Jet's failure to tender the aircraft to Eagle on or about October 15, 2008. Specifically, Caruso testified that tender of the aircraft was delayed because the FAA changed its certification rules for aircraft fuel tanks in September of 2008, indicating that this occurrence was not contemplated by WuMac or Atlanta Jet prior to entering into the contracts at issue. Doc. #53, Ex. C at 136:6-25. However, the FAA certified the modifications to CRJ 7471 on April 28, 2009, and WuMac has not identified any reason for its failure to deliver the aircraft until July 2, 2009.

Although the Court has found that there remains a question of fact as to whether WuMac was a third party beneficiary to the contract between Eagle and Atlanta Jet, the Court is concerned that WuMac's delayed delivery effectively caused Atlanta Jet's delayed delivery, which led to Eagle's repudiation of that contract. Although the FAA certification process may have justifiably delayed delivery through April 28, 2009, WuMac has identified no reason for its failure to deliver the aircraft to Atlanta Jet until July 2, 2009. The courts have equitable authority to enforce contracts as to intended third party beneficiaries who are not named in the contract. *Wright*, 597 F. Supp. 2d at 1207. However, the Court finds that it would be inequitable to enforce a contract as to a third party beneficiary who ultimately forced a substantive breach by one of the contracting parties, and WuMac has failed to produce any justification for its two-month delay of delivery after April 28, 2009. Accordingly, the Court grants Eagle's Motion for Summary Judgment as to WuMac's third party beneficiary claim.

///

///

### 3.  Flying Colours' Assigned Breach of Contract Claim

Eagle argues that the Court must grant its Motion for Summary Judgment on WuMac's assigned breach of contract claim because Flying Colours is the real party in interest for that claim. Doc. #49 at 29.  WuMac argues that it should be entitled to pursue this claim because Flying Colours lost approximately $32,000 as a result of Eagle's breach, and Flying Colours properly assigned its claim to WuMac prior to this litigation.  Gillespie of Flying Colours stated unambiguously in his deposition that Flying Colours assigned its claim to WuMac and Caruso. Doc. #53, Ex. F at 24:1-2.  Eagle has failed to establish that this assignment was invalid.  It is immaterial that if WuMac prevails, it will turn over the amount that it recovers to Flying Colours. *See Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1282 (9th Cir. 1983) ("It is not necessary that the assignors forfeit all interest in possible damages before" assigning their claims).  Eagle's argument that the verbal assignment was deficient fails because the authority cited merely states that an assignment of a claim must be absolute, not that it must be in writing.  *See* Doc. #49 at 29-30.

Eagle argues further that WuMac's assigned breach of contract claim must fail because it is based on an amendment to the Eagle/Atlanta Jet contract, and Atlanta Jet's breach discharged Eagle from any obligations under that contract.  Doc. #49 at 29.  WuMac argues that the assigned Flying Colours claim is not based on an amendment to the Eagle/Atlanta Jet contract, but is rather a separate contract established by email communications between Flying Colours and Eagle.  *Id.*, Ex. 36.  Both contracts at issue state that "the Purchase Price of the Aircraft is inclusive of new paint and interior . . . to be completed at Flying Colours Corp."  *Id.*, Ex. 7 at ECL-00035.  A conversion work order was attached to each contract, and the parties agreed that the work order could be amended by mutual written agreement.  *Id.*  In a July 9, 2009 email, Flying Colours' Gillespie informed Eagle's Brady that "[a]fter taking into consideration all Credits/Debits discussed or implemented the additional costs are currently at $36,600.00."  *Id.*, Ex. 36.  The email attached a memorandum describing the additional alterations upon which these charges were based.  *Id.*

13

The parties have not briefed this issue extensively, but based on the evidence before the Court, the July 9, 2009 email from Gillespie to Brady is an amendment that was specifically contemplated by the contracts.  As such, this amendment was dependent on Atlanta Jet's compliance with the Eagle contract.  WuMac's assigned breach of contract claim must fail because Eagle was discharged from liability under the Eagle/Atlanta Jet contract when it repudiated the contract after Atlanta Jet failed to timely deliver CRJ 7471 to Eagle.  Accordingly, the Court grants Eagle's Motion for Summary Judgment as to WuMac's assigned breach of contract claim.

**IV.  Conclusion**

IT IS THEREFORE ORDERED that Eagle's Motion for Summary Judgment (Doc. #49) is GRANTED.

IT IS FURTHER ORDERED that Eagle's request for oral argument is DENIED.

IT IS FURTHER ORDERED that WuMac's Motion to Strike (#54) is DENIED.

IT IS FURTHER ORDERED that the Court hereby enters judgment for Eagle and against WuMac.

IT IS SO ORDERED.

DATED this 5th day of March, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE